**NL INDUSTRIES, INC., Plaintiff,**

v.

**PAINEWEBBER
INCORPORATED, Defendant.**

No. 88 Civ. 8602 (MBM).

United States District Court,
S.D. New York.

Aug. 25, 1989.

E. Tom Bayko (Paul A. Share and Stephen E. Tisman, of counsel), Holtzman & Urquhart, New York City, for plaintiff.

Allen G. Reiter (Peter T. Shapiro, of counsel), Siller, Wilk, Menchen & Simon, New York City, for defendant.

## AMENDED OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff NL Industries Inc., a New Jersey corporation with its principal place of business in Texas, moves for possession of over two and one-half floors of commercial space in New York City's McGraw–Hill Building that it leased to defendant PaineWebber Inc., a Delaware corporation with its principal place of business in New York. Fed.R.Civ.P. 56(a). NL moves also for summary judgment dismissing or staying PaineWebber's counterclaim for breach of contract. Fed.R.Civ.P. 56(b). In response, PaineWebber moves to dismiss the complaint, and moves to enjoin NL from obtaining possession. Fed.R.Civ.P. 12(b)(6), 56(b), 65. Both parties have treated PaineWebber's motion to dismiss as one for summary judgment, and have adduced record evidence in support of their respective positions. Therefore, the motion will be treated as a motion for summary judgment. Fed.R.Civ.P. 12(b). For the reasons given below, NL is granted possession of the leased premises, PaineWebber's motion for summary judgment or an injunction is denied, and PaineWebber's counterclaim is stayed pending resolution by an arbitrator.

### I

The McGraw–Hill Building is located at 1221 Avenue of the Americas and is owned by Rock–McGraw, Inc. Rock–McGraw leases most of the building to McGraw–Hill, including the 30th through 32nd floors. McGraw–Hill, in turn, leases the eastern half of the 30th floor, a portion of the western half, and all of the 31st and 32nd floors to NL. On September 29, 1976, NL subleased this space to PaineWebber's predecessor in interest, Eastdil Realty, Inc., which then assigned its rights and obligations to PaineWebber. For the sake of brevity, the NL–Eastdil lease assigned to PaineWebber will be treated to as NL's lease with PaineWebber.

The lease between McGraw–Hill and NL, incorporated by reference into the lease between NL and PaineWebber, provides that the lessor will determine how much should be added to the rent to cover the cost of electricity. In practice, McGraw–Hill presents NL with an electricity bill that NL passes on to PaineWebber in the form of what the lease terms "additional rent." During the term of the lease, PaineWebber determined that it was paying for more electricity than it used. After

efforts to rectify the problem broke down, PaineWebber withheld rent in the amount of the alleged overcharge. However, even after the alleged overcharge was recovered, PaineWebber continued to pay less than the full amount of rent, asserting that it was still being billed too much for electricity. In addition, PaineWebber refused to pay for water damage allegedly caused by its air conditioner. Based on these events, NL sent PaineWebber a notice of default, which was received on October 24, 1988. On November 4, 1988, NL sent PaineWebber a notice of termination. According to the notice, the lease ended on November 7, 1988. When PaineWebber did not vacate the premises, this action ensued.

NL alleges that it followed the prescribed procedures for terminating the lease of a defaulting tenant. Therefore, NL concludes that it is entitled to possession of the property, among other remedies. For its part, PaineWebber asserts that NL did not comply with the contractual or legal requirements for terminating the lease, and further claims, among other things, that the alleged overcharges for electricity constitute a breach of contract.

## II

Merely because both parties move for summary judgment does not mean that one party must prevail. *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976) (*per curiam*). Instead, if neither party demonstrates that summary judgment in its favor is warranted, neither motion will be granted. *E.g., Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 313–14 (2d Cir.1981). Under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if the evidence offered demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party initially must inform the court of the basis for its motion, and identify "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that the movant believes dem-

onstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). When the moving party bears the ultimate burden of proof on an issue it seeks summary judgment of, it has met its burden by showing sufficient evidence to justify a jury verdict in its favor. In contrast, when the moving party does not bear the ultimate burden of proof on an issue it seeks summary judgment of, it has met its burden by indicating that the non-moving party has failed to adduce sufficient evidence to raise a genuine issue of fact about the issue. *Catrett*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53.

Once a movant meets its initial burden, thereby establishing a *prima facie* case for summary judgment, the opponent of summary judgment must adduce enough evidence to support a jury verdict in its favor. *Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510 (citing *First Nat'l Bank of Ariz. v. Cities Svc. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)); *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (2d ed. 1983 & Supp.1988). The non-moving party cannot rest upon mere allegations, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

In assessing whether there are any factual issues to be tried, a court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam*); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). However, when there is nothing more than

a metaphysical doubt as to the material facts, summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Moreover, in New York, whose law the parties have adopted in the lease, summary judgment is proper only if the language of the contract is unambiguous and reasonable persons could not differ on its meaning, and is correlatively improper when different interpretations of the contract are supportable by the record evidence. *E.g., United States Naval Inst. v. Charter Communications, Inc.*, 875 F.2d 1044, 1048 (2d Cir.1989).

### III

■ The initial issue is the proper procedure for terminating NL's lease with PaineWebber. Both parties agree on one major aspect of the controversy, that NL's lease with PaineWebber contains a conditional limitation. A conditional limitation allows a lessor to notify the tenant that an uncured default has caused the lease to end automatically—in this case after an agreed-upon number of days. Although the lessor has the right to decide whether and when to send such a notice, once the notice is sent, the leasehold will end at some definite point in the future. *TSS–Seedman's Inc. v. Elota Realty Co.*, 72 N.Y.2d 1024, 534 N.Y.S.2d 925, 531 N.E.2d 646 (1988) (mem. op.) (citing, among other authority, 2 J. Rasch, *New York Landlord & Tenant (Rasch)* §§ 23.29—29.30 (3d ed. 1988)). In contrast, if the lessor retains the option not to send a letter of termination, but actually to terminate the lease, such a termination provision is a condition subsequent, sometimes called a condition.

■ Because a conditional limitation, once invoked, brings the lease to an end, if a lessor seeks to terminate the lease for nonpayment of rent, and a tenant wishes to maintain its rights under the lease and extend the time to cure or challenge the validity of the termination, the tenant must obtain injunctive relief to toll the running of the cure period. *E.g., First Nat'l Stores, Inc. v. Yellowstone Shopping Cen-*

*ter, Inc.*, 21 N.Y.2d 630, 637, 290 N.Y.S.2d 721, 725, 237 N.E.2d 868, 870–71 (1969); *144 E. 40th St. Leasing Corp. v. Schneider*, 125 A.D.2d 195, 508 N.Y.S.2d 459 (1st Dep't 1986) (mem. op.); *Times Square Stores Corp. v. Bernice Realty Co.*, 107 A.D.2d 677, 484 N.Y.S.2d 591 (2d Dep't 1985) (mem. op.). In contrast, if a lessor invokes a condition subsequent based upon a tenant's failure to pay rent, the lessor must go to court, obtain a favorable judgment, and then give the tenant 10 additional days from the date of the judgment to cure the defect. N.Y.Real Prop.Acts. & Proc.Law § 751(1) (McKinney 1979). Therefore, if a lessor could terminate a tenancy for nonpayment of rent only by invoking a condition subsequent, the lessor would be required to obtain a judgment against the tenant, and then give the tenant 10 days to pay the delinquent rent. *Hollymount Corp. v. Modern Bus. Assocs.*, 140 A.D.2d 410, 528 N.Y.S.2d 113 (2d Dep't 1988) (mem. op.); see Affidavit of Ann S. Goldwater Exhibits B & C (record on appeal in *Modern Bus. Assocs.* indicates that lessor could terminate tenant for nonpayment of rent by invoking condition subsequent).

■ It is important to stress at the outset that the current matter involves commercial and not residential property. The rules that govern the two, including case law, are quite different. Thus, although conditional limitations are not enforced against residential tenants, they are enforced to terminate commercial leases. *Compare, e.g., T.W. Dress Corp. v. Kaufman*, 143 A.D.2d 900, 533 N.Y.S.2d 548 (2d Dep't 1988) (mem. op.) (conditional limitation in commercial lease enforced and leasehold terminated) *with Post v. 120 East End Ave. Corp.*, 62 N.Y.2d 19, 475 N.Y. S.2d 821, 464 N.E.2d 125 (1984) (by statute, conditional limitations are unenforceable against residential tenants in New York City). Moreover, once the lease is terminated, it cannot be revived, absent a showing of fraud, mutual mistake, or some other basis for reformation. *Yellowstone Shopping Center, Inc.*, 21 N.Y.2d at 637,

290 N.Y.S.2d at 725, 237 N.E.2d at 870–71 (1969).

■ PaineWebber argues that § 751(1) operates to preserve a lessee's rights until 10 days after entry of a judgment where the lessor seeks to regain possession because the tenant refuses to pay the proper rent. The statute provides in part:

Where the lessee or tenant holds over after a default in the payment of rent, ... he may effect a stay by depositing the amount of rent due ... with the clerk of the court ... within ten days [after a judgment is entered], at the expiration of which time a warrant may issue....

PaineWebber argues that when a conditional limitation operates to terminate a lease, the tenant becomes a holdover tenant. PaineWebber concludes that the statute, by its terms, applies to protect it and other holdover tenants. Therefore, PaineWebber asserts that NL must obtain a court order permitting it to terminate the lease, and then must give PaineWebber 10 days to cure, as mandated by § 751(1). PaineWebber argues that because NL did not follow these procedures, it has not terminated the lease, and therefore, its suit to regain possession should be dismissed. PaineWebber's contentions are without merit. Section 751(1) has been held to apply only to summary proceedings brought to enforce a condition subsequent that terminates a lease. *Grand Liberte Cooperative, Inc. v. Bilhaud*, 126 Misc.2d 961, 963–64, 487 N.Y. S.2d 250, 252 (Sup.Ct.App.Term 1984) (*per curiam*). In contrast, the provision is inapplicable when a lessor seeks to recover commercial property after a lease has terminated pursuant to a conditional limitation, which is what NL seeks to do here. *Id.*

■ PaineWebber also argues that the statute should be applied to this proceeding for equitable reasons, in order to prevent it from forfeiting its leasehold for a relatively trivial violation. Initially, it should be noted that there is no evidence that NL, Eastdil, or PaineWebber are anything other than commercial parties of equal bargaining strength, which militates against equitable intervention. *Estate of*

*Birnbaum v. Yankee Whaler, Inc.*, 75 A.D.2d 708, 427 N.Y.S.2d 129 (4th Dep't) (mem. op.), *aff'd mem.* 51 N.Y.2d 935, 434 N.Y.S.2d 994, 415 N.E.2d 982 (1980). In addition, there is no evidence of fraud, overreaching, or other unconscionable conduct. *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577, 415 N.Y.S.2d 800, 803, 389 N.E.2d 113, 116 (1979). Moreover, PaineWebber's defaults were not trifling or inadvertent. The firm knowingly, intentionally, and repeatedly violated its covenant to pay rent, a fundamental obligation of the lease. *Pioneer Auto Parks, Inc.*, 46 N.Y.2d at 578, 415 N.Y.S.2d at 803, 389 N.E.2d at 116. Additionally, the application of the forfeiture provisions of the lease is not void as a penalty. As the court in *Pioneer Auto Parks, Inc.* noted, the lessor often relies on timely payment of rent to meet its own outstanding obligations, and the failure to pay the proper rent therefore puts the lessor in a financial bind. 46 N.Y.2d at 578, 415 N.Y.S.2d at 803, 389 N.E.2d at 116. Accordingly, PaineWebber's argument that equity mandates the application of § 751(1) to its case is also without merit. As a result, NL may terminate the lease with PaineWebber by following the lease-mandated termination procedures. It is those provisions which provide the next ground for litigation between the parties.

### IV

NL's lease with PaineWebber permits the lease to be terminated by service of a notice of default, followed by a notice of termination. The termination provision is set forth at pages 12–13 below. In essence it requires NL to notify PaineWebber of any alleged defaults; then, if PaineWebber does not cure the defaults within 10 days, it allows NL to issue a notice of termination, which ends the lease automatically three days after the notice is issued. PaineWebber asserts that the notice it received on October 24, 1988 was insufficient, and therefore, that the period to cure the defaults never began to run. That notice is sometimes called a notice to cure or a notice of default.

In New York, "the purpose of a [n]otice to [c]ure is to specifically apprise the tenant of claimed defaults in its obligations under the lease and of the forfeiture and termination of the lease if the claimed default is not cured within a set period of time." *Filmtrucks, Inc. v. Express Indus. & Terminal Corp.*, 127 A.D.2d 509, 510, 511 N.Y.S.2d 862, 864 (1st Dep't 1987) (mem. op.). Moreover, a notice to cure must comply strictly with the lease, because it is the instrument by which a lessor exercises the extreme right of prematurely ending a leasehold interest. *See, e.g., Yellowstone Shopping Center, Inc.*, 21 N.Y.2d at 637, 290 N.Y.S.2d at 725, 237 N.E.2d at 870–71 (notice of termination); *Perrotta v. Western Regional Off–Track Betting Corp.*, 98 A.D.2d 1, 6–7, 469 N.Y.S.2d 504, 507 (4th Dep't 1983) (same); *Kirschenbaum v. M–T–S Franchise Corp.*, 77 Misc.2d 1012, 1014, 355 N.Y.S.2d 256, 258 (N.Y.City Civ.Ct.1974) (same); *see also Hocker v. Heins*, 231 N.Y.S.2d 481, 483–84 (Sup.Ct. Suffolk County 1962) (same in residential context). However, there is no authority for PaineWebber's proposition that, as a matter of law, the notice must be labeled a notice to cure.

The notice to cure also must "tie the ... demand [to cure a default] to the forfeiture provisions of the lease...." *57 E. 54 Realty Corp. v. Gay Nineties Realty Corp.*, 71 Misc.2d 353, 354–55, 335 N.Y.S.2d 872, 873 (App. Term 1st Dep't 1972) (notice of termination). However, contrary to PaineWebber's assertion, there is no authority for the proposition that in a commercial context, NL's notice must cite the lease termination provision, explain its substance, include the length of the cure period, explain NL's rights in the event of a failure to cure, and explain that NL's intends to terminate in the event that the defaults are not cured. In a commercial setting, if the notice refers either to the specific termination provision or summarizes its terms, that is sufficient to put the lessee on notice that its leasehold is in jeopardy. *See Express Indus. & Terminal Corp.*, 127 A.D.2d at 511, 511 N.Y.S.2d at 864; *see also Western Regional Off–Track Betting Corp.*, 98 A.D.2d at 6–7, 469 N.Y.

S.2d at 507 (notice of termination). Therefore, where, as here, the cited lease provision contains all the information necessary to calculate the permissible period for cure, and the consequences if no cure is effected, that information need not be recited in the notice.

When measured by these criteria, the notice PaineWebber received on October 24 is legally sufficient. The notice states in relevant part:

PaineWebber ... is hereby given notice, pursuant to the terms of § 16 of the [lease between NL and PaineWebber], of the following eight defaults of [PaineWebber] under the [lease]:

1. Failure of [PaineWebber] to pay NL [b]ase [r]ent due under § 4 of the [lease between NL and PaineWebber] and the [o]ther [r]ental [c]harges due under § 5 of the [lease between NL and PaineWebber] for the month of April, 1988, in the amount of $208,-218.38;

2. Failure of [PaineWebber] to pay NL [o]ther [r]ental [c]harges due under § 5 of the [lease between NL and PaineWebber] for the month of May, 1988, in the amount of $32,468.06;

3[–7]. Failure of [PaineWebber] to pay NL [o]ther [r]ental [c]harges due under § 5 of the [lease between NL and PaineWebber] for the month[s] of [June through October, 1988], in the amount of $3,822.15 [per month, totalling $19,110.75]; and

8. Failure of [PaineWebber] to pay NL for water damage in 1986 from a leak in a [PaineWebber] air conditioning unit, under § 2 of the [lease between NL and PaineWebber], in the amount of $68,350.58.

Section 16 of the lease from NL to PaineWebber, referred to in the introductory paragraph, entitled "Default," provides:

If (a) [PaineWebber] shall default in fulfilling any of the terms, covenants, provisions, conditions or agreements hereof, other than the covenant to pay rent or additional rent, or of the [lease between McGraw–Hill to NL], and such

default shall not have been remedied (or proper corrective measures to cure such default commenced) within twenty (20) days after receipt from NL of a notice specifying the same, or, in the case of such default which for causes beyond [PaineWebber]'s control cannot with due diligence be cured within said period of 20 days, if [PaineWebber] (i) shall not, promptly upon the giving of such notice, give NL notice of [PaineWebber]'s intention to duly institute all steps necessary to remedy such default, (ii) shall not duly institute and thereafter diligently prosecute to completion all steps necessary to remedy the same, or (iii) shall not remedy the same within a reasonable time after the date of the giving of said notice by NL, NL may give to [PaineWebber] three (3) days' notice of intention to end the term of this [lease], and at the end of said three (3) days, the term of this [lease] shall expire with the same effect as if that day were the date set forth in § 3 for the termination of the term hereof, ...; or (b) [PaineWebber] shall fail to pay the base rent and additional rent as provided herein, then NL may, unless [PaineWebber] shall have cured such default within ten (10) days after written notice thereof from NL, exercise any of the remedies, including, but not limited to, re-entry into or upon the [p]remises of [McGraw–Hill].... (emphasis added).

PaineWebber argues that this contractual provision requires NL to specify in the notice to cure how many days PaineWebber has in which to remedy its alleged default. Because the notice to cure does not do so, PaineWebber concludes that it is not in strict accordance with the contractual termination provision, and therefore is a nullity.

■ More specifically, PaineWebber notes that the three-day notice of intention to terminate is mentioned only in § 16(a). It argues that the underlined language in § 16(a)—"twenty (20) days after receipt from NL of a notice specifying the same" —mandates that NL specify not only what the claimed default is, but how long PaineWebber has to cure it. Therefore, it asserts that by analogy the emphasized portion of § 16(b) also must require that NL indicate not only that the default is for nonpayment of rent, but also how long PaineWebber has to cure the default.

When read fairly, the contract does not support PaineWebber's position. The underlined language in both subsections of § 16 grants PaineWebber the right to be notified of the type of default alleged. It does not grant PaineWebber the right to be told of the period for cure. Specifically, the words "the same" in the phrase "notice specifying the same" in § 16(a) refer to the fact and nature of the default, just as the word "thereof" in the phrase "written notice thereof" in § 16(b) refers to the fact and nature of the default. Neither the words "the same" in § 16(a) nor the word "thereof" in § 16(b) requires notice of the period for cure. That can be gleaned from the contract provisions to which NL was obligated to refer in its notice of default, and to which it did refer.

■ The notice explained the substance of each alleged default, and which provision of the lease was violated by which default, and then made specific reference to the forfeiture provisions of the lease. Therefore, the notice gave PaineWebber sufficient warning that the enumerated acts violated the enumerated lease provisions, which would cause the enumerated termination provision to be invoked, causing PaineWebber to lose the leasehold.

■ PaineWebber also asserts that the entire notice is deficient because NL failed to indicate what provision of the lease was violated when PaineWebber failed to reimburse NL for water damage caused by a leak in PaineWebber's air conditioner. In its notice to cure, NL asserted that the damage to the building violated § 2 of NL's lease with Eastdil. However, § 2 merely incorporates by reference all of the provisions of the lease from McGraw–Hill to NL. Therefore, PaineWebber concludes that it was not told with sufficient specificity which provision it violated by allowing water to damage the building. *See Chinatown Apartments, Inc. v. Lam,* 51 N.Y.2d 786, 433 N.Y.S.2d 86, 412 N.E.2d 1312

(1980) (mem. op.) (in residential context, combined cure and termination notice that does not explain what lease provision was violated is ineffective). Presuming for the sake of argument that PaineWebber is correct, at most this would mean that NL could not terminate its lease with PaineWebber solely because PaineWebber's air conditioning system damaged the McGraw–Hill Building. In fact, NL bases the termination on PaineWebber's failure to pay rent, not on its failure to reimburse NL for water damage.

PaineWebber also asserts the reference to the water damage default confused it about the length of time it had to cure its defaults. PaineWebber's arguments are not only unsupported by record evidence, but also are refuted by it. A fair reading of the lease indicates that PaineWebber had 10 days to pay back rent, and 20 days to begin repair work on the water damage. Therefore, either the failure to pay back rent within 10 days or the failure to begin repairs on the water damage within 20 days would trigger NL's termination rights.

Additionally, as noted before, there has been no evidence that NL's notice or any of its other conduct was fraudulent, exploitative, overreaching or unconscionable. *See Pioneer Auto Parks, Inc.*, 46 N.Y.2d at 578, 415 N.Y.S.2d at 803, 389 N.E.2d at 116; *Tehan v. Thomas C. Peters Printing Co.*, 71 A.D.2d 101, 106, 421 N.Y.S.2d 465, 468 (4th Dep't 1979); *Gay Nineties Realty Corp.*, 71 Misc.2d at 354–55, 335 N.Y.S.2d at 873.

■ PaineWebber argues that the cure period for its water damage default had not expired when the notice of termination was sent, and therefore, that the notice of termination is invalid. But the period for curing the rent defaults had run, which gave NL the right to terminate the lease. Again, termination was for nonpayment of rent, not for failure to repair water damage.

### V

■ PaineWebber argues that even if the cure period has expired, it should be given one final opportunity to cure its violations. Therefore, it seeks to enjoin the running of the cure period. *See Yellowstone Shopping Center, Inc.*, 21 N.Y.2d at 637, 290 N.Y.S.2d at 725, 237 N.E.2d at 870–81; Fed.R.Civ.P. 65. In that regard, PaineWebber indicates that in New York, if the parties enter into protracted and lengthy negotiations to cure defects after the cure period has expired, then a new cure period will be deemed to exist. *See Zukerman v. 33072 Owners Corp.*, 97 A.D.2d 736, 738, 468 N.Y.S.2d 639, 642 (1st Dep't 1983) (mem. op.) (negotiations involving residential lease continued after an appeal is argued may extend the cure period); *TSS–Seedman's, Inc. v. Elota Realty Corp.*, 134 A.D.2d 492, 521 N.Y.S.2d 277 (mem. op.) (2d Dep't 1987) (commercial parties' extensive negotiations during lease's renewal term gives tenant more time to cure defaults), *aff'd mem.*, 72 N.Y.2d 1024, 534 N.Y.S.2d 925, 531 N.E.2d 646 (1988). However, in this case, evidence shows that NL sent PaineWebber one letter during the cure period exhorting it to cure while indicating that it did not mean by its exhortation to waive its right to demand a cure. Affidavit of Fred Catalano (Catalano Affidavit) Exhibit U. In response, PaineWebber sent NL one letter saying that in its opinion, it was in compliance with the lease. Catalano Affidavit Exhibit V. These letters, and two or three telephone calls between the parties, affidavit of Edwin Johnson at ¶¶ 5, 7, even when seen from PaineWebber's perspective, do not raise a genuine issue about whether there were extensive negotiations ongoing at the time the cure period ended.

### VI

■ PaineWebber asserts that when NL accepted no rent in April 1988, and partial payments in May through October 1988, NL waived compliance with the provision calling for timely and complete rental payments. The lease between McGraw–Hill and NL, incorporated by reference into the lease between NL and PaineWebber provides in relevant part:

TWENTY–FIRST. ... *No Waivers.*

. . . . .

The failure of either party to insist in any instance upon the strict keeping, observance or performance of any covenant ... of this [l]ease or to exercise any election herein contained shall not be construed as a waiver or relinquishment for the future of such covenant ..., but the same shall continue and remain in full force and effect. No waiver or modification by either party of any covenant ... of this [l]ease shall be deemed to have been made unless expressed in writing and signed by the party to be charged.... The receipt and retention by the [l]andlord [McGraw–Hill] of fixed rent or additional rent with knowledge of the breach of any covenant ... herein contained shall not be deemed a waiver of such breach.

"The trend of the modern cases is to uphold such a [non-waiver] provision." 2 *Rasch* § 23.17. For example, if a lease contains a non-waiver provision, a lessor's acceptance of rent despite a ten-year pattern of defaults will not waive the lessor's right to terminate based on those defaults, provided that the notice of the default is given soon after the tenant seeks to exercise its option to renew. *Jefpaul Garage Corp. v. Presbyterian Hosp.,* 61 N.Y.2d 442, 446, 474 N.Y.S.2d 458, 460, 462 N.E.2d 1176, 1178 (1984); *accord 1014 Fifth Ave. Realty Corp. v. Manhattan Realty Co.,* 67 N.Y.2d 718, 499 N.Y.S.2d 936, 490 N.E.2d 855 (1986) (mem. op.) (purchase option). In upholding the nonwaiver clause, the Court in *Presbyterian Hosp.* held that "[i]ts language is clear and unambiguous. The parties having mutually assented to its terms, the clause should be enforced to preclude a finding of waiver of the conditions precedent to renewal." 61 N.Y.2d at 446, 474 N.Y.S.2d at 460, 462 N.E.2d at 1178 (citing authority, including *650 Madison Ave. Corp. v. Wil–Low Cafeterias, Inc.,* 95 F.2d 306 (2d Cir.), *cert. denied,* 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533 (1938)). With its decision in *Presbyterian Hosp.,* the Court of Appeals resolved what inferior courts had regarded as a debatable issue—wheth-

er, despite a nonwaiver provision, acceptance of rent with knowledge of defaults waives the right to rely on those defaults to terminate the lease. *See In re Delta Motor Hotel of Syracuse, Inc.,* 10 B.R. 585, 596–97 (Bankr.N.D.N.Y.1981) (enforceability of non-waiver clauses that do not specifically refer to rental acceptance is "less than settled" in New York); *Malloy v. Club Marakesh, Inc.,* 71 A.D.2d 614, 616, 418 N.Y.S.2d 135, 138 (2d Dep't 1979) (mem. op.) (dictum). *Presbyterian Hosp.* controls here, and the non-waiver provision defeats PaineWebber's argument.

 PaineWebber also asserts that on November 3, 1988, after the cure period passed, NL cashed PaineWebber's November rent check, thereby reviving the terminated lease. However, as is the normal rule in real estate matters, the notice to cure was effective upon its receipt by PaineWebber, on October 24, 1988. *Grabino v. Howard Stores Corp.,* 110 Misc.2d 591, 593–94, 442 N.Y.S.2d 713, 715 (N.Y.City Civ.Ct.1981); *98 Delancey St. Corp. v. Barocas,* 82 N.Y.S.2d 802, 805 (Sup.Ct.N.Y. County 1948), *aff'd mem.,* 275 A.D. 651, 86 N.Y.S.2d 659 (1st Dep't 1949). Therefore, the cure period extended through November 3, 1988. As PaineWebber admits, NL may accept rent up until the end of the cure period and not waive its objections. *Witkoff v. Shopwell, Inc.,* 112 A.D.2d 295, 296, 491 N.Y.S.2d 740, 742 (2d Dep't 1985) (mem. op.) (citing authority). Therefore, NL's cashing of PaineWebber's rent check on the last day of the cure period did not waive its objections to PaineWebber's defaults.

 PaineWebber would apply principles of equitable estoppel to prevent NL from terminating the lease. PaineWebber maintains that sometime in 1986 it had withheld rent, thereby prompting NL to agree to help in reducing the electricity charges passed through from McGraw–Hill. PaineWebber asserts that NL then inexplicably changed course, ignored its pleas for help, and decided to begin terminating the lease instead of helping PaineWebber negotiate with McGraw–Hill. PaineWebber argues that it detrimentally re-

lied on NL's assurance of help, thereby raising the estoppel.

The doctrine of equitable estoppel should be applied with great caution when dealing with realty. *Huggins v. Castle Estates, Inc.*, 36 N.Y.2d 427, 433, 369 N.Y.S.2d 80, 87, 330 N.E.2d 48, 53 (1975) (residential property). Even assuming that NL's alleged oral agreement to aid PaineWebber is not barred by the statute of frauds, PaineWebber has neither asserted nor shown that NL promised to forbear terminating its lease with PaineWebber until the dispute with McGraw–Hill was settled. It does not make sense that NL would absorb the overcharge itself when it could pass on the entire electricity bill—including the alleged overcharges—to PaineWebber. Therefore, PaineWebber has not indicated why this alleged agreement to help is even relevant to this dispute. As PaineWebber has not shown that NL waived or is estopped from terminating the lease based on PaineWebber's failure to pay rent, PaineWebber's motion for summary judgment dismissing this suit on these grounds is denied. Moreover, as NL has complied with the termination provision of its lease with PaineWebber, and has not run afoul of any legal impediments to termination, summary judgement awarding it possession of the leased premises is granted.

## VII

The final matter to be resolved is whether PaineWebber's second counterclaim, brought against NL for electricity overcharges, should be arbitrated or dismissed. (PaineWebber now concedes that the claim cannot be litigated in this forum.) The lease between McGraw–Hill and NL provides in pertinent part that when the tenant seeks to change the amount the paid for electricity, the lessor must notify the tenant in writing of how much the lessor is willing to adjust the bill. Under the lease, the lessee then has 30 days to protest in writing, and in the absence of a timely protest, the lessor's proposal becomes binding. However, if a protest is filed in 30 days, the preadjustment electricity rate remains in effect until arbitrators resolve the dispute. Therefore, as the parties implicitly concede, this is a narrow arbitration clause, giving the arbitrator power to resolve a limited dispute.

■■■■ The parties agree that the arbitration clause reserves to the arbitrator only the issue of what the proper electricity charge should be. Additionally, they agree that PaineWebber's timely filing of a written protest is a condition precedent to invoking the arbitration clause. Therefore, under New York law, which the parties agree controls NL's motion, the question of whether PaineWebber properly invoked the arbitration clause is resolved by the court, not the arbitrator. *Silverstein Props., Inc. v. Paine, Webber, Jackson & Curtis, Inc.*, 65 N.Y.2d 785, 493 N.Y.S.2d 110, 482 N.E.2d 906 (1985) (mem. op.). If PaineWebber did not comply with an express condition precedent to invoking the arbitration clause, then PaineWebber cannot maintain its claim in this forum or in arbitration. *See, e.g., Pearl St. Dev. Corp. v. Conduit & Found. Corp.*, 41 N.Y.2d 167, 170, 391 N.Y.S.2d 98, 100, 359 N.E.2d 693, 694–95 (1976).

■■■ The record is sparse, but it reveals that sometime after September 19, 1986, NL received a copy of the McGraw–Hill explanation at issue here. On October 6, 1986, NL wrote to McGraw–Hill disputing the electrical charges "pending a review ... by both NL and Paine Webber, Inc." Catalano Affidavit Exhibit K. When seen in the light most favorable to PaineWebber, this is at least some evidence that NL began to challenge on PaineWebber's behalf the electricity bill passed through from McGraw–Hill, even though NL had not received a written protest from PaineWebber. In other words, it is some evidence that NL knowingly and intentionally relinquished a known right to receive a written protest from PaineWebber before the electricity bill became an arbitrable dispute. *Silverstein Props., Inc. v. Paine, Webber, Jackson & Curtis, Inc.*, 104 A.D.2d 769, 771, 480 N.Y.S.2d 724, 726 (1st Dep't 1984) (mem. op.), *aff'd mem.* 65 N.Y.2d 785, 493 N.Y.S.2d 110, 482 N.E.2d 906 (1985). Although this evidence may not withstand the

scrutiny it would receive at a full trial on the merits, it is sufficient to defeat the current motion for summary dismissal. Accordingly, NL's motion to dismiss the second counterclaim is denied; its motion to stay the counterclaim pending its resolution by an arbitrator is granted as unopposed.

SO ORDERED: